IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| 55 KENMORE LANE, LLC, | : | |
| *Assignee of Kenmore Woods, LLC* | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. 10-1089 |
| v. | : | |
| | : | |
| UPPER PROVIDENCE TOWNSHIP, | : | |
| UPPER PROVIDENCE TOWNSHIP | : | |
| SEWER AUTHORITY, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

DAVID R. STRAWBRIDGE                                                November   16, 2010
UNITED STATES MAGISTRATE JUDGE


Presently before the Court is the Motion for Summary Judgment filed by Defendants Upper

Providence Township ("UPT") and Upper Providence Township Sewer Authority (the "Authority")

(Doc. No. 17) (the "Motion"), together with Plaintiff 55 Kenmore Lane, LLC, Assignee of Kenmore

Woods, LLC's "Answer of Plaintiff, Kenmore Woods, LLC to Motion for Summary Judgment of

Upper Providence Township and Upper Providence Township Sewer Authority" (Doc. 19) and

"Memorandum of Law of Plaintiff Kenmore Woods, LLC" (Doc. 20) (collectively "Response") and

the "Defendants', Upper Providence Township and Upper Providence Township Sewer Authority,

Reply Brief in Support of Motion for Summary Judgment"(Doc. 25) ("Reply").[1]  The matters are

---

[1]The Complaint identifies "55 Kenmore Lane, LLC/Assignee of Kenmore Woods, LLC"
as Plaintiff.  The papers submitted here generally refer to conduct involving Kenmore Woods,
LLC and do not appear to highlight any activity of 55 Kenmore Lane, LLC, other than the fact
that it has taken an assignment from Kenmore Woods, LLC and is the entity that has brought this
suit.  Thus, when we refer to "Kenmore," we do so with respect to the conduct of Kenmore
Woods, LLC.  When we refer to "Plaintiff," we do so with respect to the position of 55 Kenmore
Lane, LLC in the bringing of this action.

now fully briefed, the Court has had the benefit of oral argument and has made a determination as set out in its Order entered on November 15. 2010 (Doc. 29). In this Memorandum Opinion, we set out our reasoning pertaining to the order that grants the motion with respect to Plaintiff's constitutional claim set out in Count One, denies the motion with respect to Plaintiff's state law claims set out in Counts Two through Six, and grants the motion with respect to Plaintiff's claims for counsel fee set out in Count Seven to the extent that those claims are dependent upon the survival of Count One. Further, the Court has determined that it will retain jurisdiction of the case and trial of Counts Two through Six shall commence on Monday, December 6, 2010 as scheduled. (*See* Doc. 24.)

## BACKGROUND

In its complaint, Plaintiff has set out a claim for "Denial of Due Process Under Color of State Law" pursuant to 42 U.S.C. § 1983 (Count One), together with state law claims for "Breach of Contract" (Count Two), "Misrepresentation" (Count Three), "Promissory Estoppel" (Count Four), "Unjust Enrichment" (Count Five), and a "Violation of Statute – 53 Pa. C.S.A. § 5307(d)(31)(iv)" (Count Six). Plaintiff also asserts a claim for "Counsel Fees and Costs" under 42 U.S.C. § 1988 directly associated with the claim for the constitutional violation set out in Count One.

The facts around which Plaintiff has constructed these claims concern a dispute between Kenmore, controlled by a Delaware County developer, Robert DiDomenico, and defendants, over the question of Kenmore's claim for reimbursement for expenditures incurred in the construction of an extended sewer line (the "Kenmore Line") in support of a residential development project it was undertaking known as 211 Sycamore Mills Road, Upper Providence Township, Delaware County, Pennsylvania and operating through Kenmore Woods, LLC.

On July 5, 2007, UPT entered into a subdivision agreement with Kenmore approving Kenmore's plan with certain requirements, including that the:

> Developer [Kenmore] shall create and install all sanitary, sewer and storm sewer facilities as shown on the Plan in accordance with the recommendations of the Township Engineer and requirements of the Township Ordinances and Specifications, and more particularly in a manner to ensure safe and adequate drainage of storm water and sewage from the said tract of ground, under or across the same, in accordance with said Specifications.

(Exhibit 1 to the Motion, p. 2.)

As matters progressed, and upon the filing of an application with UPT for approval of a final subdivision and land development plan, Kenmore and the Authority entered into a Sewer Improvements Development Agreement ("SIDA"), dated August 8, 2007. That agreement set out the nature of the arrangement between Kenmore and the Authority and concluded:

> Developer and Authority acknowledge and agree that pursuant to the provisions of the Municipality Authorities Act (the "Act"), 53 Pa. C.S.A. § 5601, *et seq.*, including but not limited to 53 Pa. C.S.A. § 5607(d)(31), since Developer will be constructing or causing to be constructed at its expense an extension of the Authority's sewer system, the Authority shall provide for the reimbursement to Developer when the owner of another property not in the Kenmore Woods subdivision connects a service line directly to the extension within ten (10) years of the date of dedication of the extension to the Authority, in accordance with the provisions of the Act. Contemporaneously with the dedication of the Sanitary Sewer Improvements, Developer and Authority shall enter into a reimbursement agreement attaching as an exhibit an itemized listing of all sewer facilities for which reimbursement will be provided, which shall include but not be limited to all sanitary sewer facilities constructed by or on behalf of Developer in the rights-of-way of Sycamore Mills Road, Rose Tree Road and/or Providence Road. The amount of the reimbursement which Developer may receive shall be calculated in accordance with 53 Pa. C.S.A. § 5607(d)(31)(iv).

(Exhibit 12 to the Motion, p. 6)

Plaintiff argues that this language imposes upon the Authority the responsibility for reimbursement in accordance with the Municipal Authorities Act ("MAA") or otherwise. The Authority points out, however, that any obligation running to the benefit of the developer for reimbursement comes about only "when the owner of another property not in the Kenmore Woods subdivision connects a service line directly to the extension . . ." and that this circumstance never came about. Plaintiff, acknowledging this language in the agreement, (without conceding any particular legal significance) argues that the Authority effectively controlled this conditional because the owners of the other properties who might have been in a position to connect their lines could do so only upon the direction of UPT or the Authority.

By early 2009, Plaintiff completed the Kenmore Line and was apparently ready to accommodate the connections which had been the subject of discussion involving the Authority engineers and Kenmore. Kenmore had an understanding from these discussions that UPT and the Authority would support connections from the Springton Lake Middle School (the "School"), the Lutheran Reformation Church (the "Church") and ten residences along Sycamore Mills Road (the "Residences"), and that these connections would provide a source of reimbursement to Kenmore for its construction costs. Plaintiff argues that it was upon this understanding and representations made by UPT and the Authority that Kenmore determined to incur the substantial additional expenses in constructing the Kenmore Line as it did.

Plaintiff alleges that unbeknownst to it, UPT and the Authority had already been in discussions with another sewer authority (the Central Delaware County Authority) to increase the overall sewage capacity of the Township in specific areas which would put the School, the Church and the Residences in a position where they would have to hook up to this new sewer line as opposed

to the Kenmore Line. Plaintiff argues that by this conduct the defendants concealed and misrepresented material facts to Kenmore, have been unjustly enriched, have breached the SIDA, have violated the MAA and should be estopped from walking away from their obligations.

Defendants argue that the choice Kenmore made to construct the Kenmore Line as it did was motivated by apparent difficulties with other possible options and that the line it was required to construct for the development would likely have had to follow the same right-of-way that the Kenmore Line ultimately used such that Kenmore suffered either no or minimal damage. Further, defendants argue that the Authority was doing nothing more than "trying to find a way through a maze of conflicting interests and overlapping jurisdiction and still provide the residents of UPT an adequate sewer system" and that Kenmore entered upon this "hodgepodge of interests and jurisdiction" with the expectation that the only proper point of response from the Authority should have been considering the particular interest of Kenmore. (*See* Doc. 17 at 37-38.) This the Authority says it cannot do. We are now left to consider the parties' positions as they have been developed on the record before us and against the standards set out to guide us at this stage.

## SUMMARY JUDGMENT STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2) (Dec. 1, 2009). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it could be said to affect the outcome of the case under governing law. *Id.* The moving party bears the initial burden of "'showing' – that is, pointing out to the district court – that there is

an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In order to successfully oppose a properly supported motion, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). In reviewing the summary judgment record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir. 1994). The court may not make credibility determinations or weigh the evidence in reaching its conclusion. *See Anderson*, 477 U.S. at 255 (observing that these are jury functions).

## ISSUES OF MATERIAL FACT

Plaintiff claims that there has been an unconstitutional "taking" by the Authority by virtue of its acceptance of the deed of dedication presented in May 2009 without disclosure of its knowledge that the path to reimbursement to Kenmore was in jeopardy. Plaintiff further asserts that the Authority's decision to become part of the Township-wide sewer improvement plan, without notice to Kenmore, eliminated the opportunity for Kenmore to be heard or to adjust its position and resulted in an unconstitutional taking in violation of Kenmore's due process rights under the Fourteenth Amendment.

On their behalf, defendants assert that the decision made by Kenmore to construct the Kenmore Line after discussion with Authority engineers and engineers on behalf of the School and the Church was not forced upon them by the defendants, nor did the defendants otherwise "demand" that Kenmore construct the expanded line and that it entered upon that decision for its own reasons. Indeed, the defendants point to several potential problems Kenmore had in considering alternate

sewer connections for its development which, according to the defendants, were unrelated to UPT or the Authority but significantly influenced the decisions both of Kenmore and the potential users of the Kenmore Line. Important among them was whether the Lemon Street Pump Station, where the sewage sourced from potential users, would have been willing or able to accept any of this additional sewage. UPT and the Authority also raise the question of whether Kenmore was motivated to construct the Kenmore Line as it did because another alternative for sewage treatment operations to benefit its own development was complicated by whether there would be approvals by the Pennsylvania Department of Environmental Protection. The significance of these conflicting assertions is that we are unable to conclude on the record before us at this stage that there is no genuine issue of material fact. Indeed, the fact issues in dispute go directly to actions taken or not taken by defendants, by Kenmore and by involved third-parties, and the resolution of these questions will be necessary to resolve the case.[2] For this reason and, with the exception of Plaintiff's

---

[2]We note that defendants' "Statement of Undisputed Material Facts in Support of Motion for Summary Judgment" (Doc. 17 at pp. 23-36 of 57) ("Undisputed Facts") is, in fact, disputed in significant ways by Plaintiff in its "Memorandum of Law of Plaintiff Kenmore Woods, LLC and Plaintiff Kenmore Woods, LLC's Counter-Statement of Facts." (Doc. 20 at 1-13 of 37.) ("Plaintiff's Response"). By way of example, compare Plaintiff's Response to Defendant's Undisputed Facts at paragraphs 28-32 (Doc. 17, pp. 27-28 of 57), where Plaintiff responds paragraph by paragraph to Defendant's Undisputed Facts with respect to what Plaintiff, through DiDomenico, would have known or believed concerning the Pennsylvania Department of Environmental Protection's position on whether Kenmore could use existing sewer lines (Doc. 20, pp. 4-6 of 37); Plaintiff's Response to Defendant's Undisputed Facts in paragraph 36 (Doc. 17, pp. 28-29 of 57), concerning the circumstances of the sizing of the extension line (Doc. 20, p. 6 of 37); Plaintiff's Response to Defendant's Undisputed Facts in paragraph 38 (Doc. 17, p. 29 of 57) with respect to any entitlement Kenmore might have had to reimbursement from the Residences (Doc. 20, p. 7 of 37); Plaintiff's Response to Defendants' Undisputed Facts in paragraphs 42-46 (Doc. 17 pp. 30 of 57), concerning the difficulty with connecting to the Lemon Street Pump Station, Kenmore's knowledge of any such difficulty and what, if any, action the Lemon Street operations would be able to take (Doc. 20, p. 8 of 37); Plaintiff's Response to Defendants' Undisputed Facts in paragraph 57 (Doc. 17, p. 32 of 57), with respect to when Plaintiff was made aware that the Central Delaware County Sewer Authority system was to be

constitutional claims in Counts One and Seven, we are unable to conclude that Plaintiff is entitled to Judgment as a matter of law. Accordingly, Defendants' Motion for Summary Judgment with respect to Counts Two, Three, Four, Five and Six is DENIED.

## PLAINTIFF'S CONSTITUTIONAL CLAIM

We next consider whether these disputed issues of fact are material such as to preclude the entry of summary judgment against Plaintiff on its constitutional claim set out in Count One. Acknowledging, as we have already determined that there are genuine issues of fact, we consider this claim as against the "Plaintiff Kenmore Woods, LLC Counter-Statement of Facts" (Doc. 19, pp. 5-19 of 20) which has been presented by Plaintiff with its "Answer of Plaintiff Kenmore Woods, LLC to Motion for Summary Judgment of Upper Providence Township and Upper Providence Township Sewer Authority." (Doc. 19.) The constant theme running through Plaintiff's counter-statement is that the defendants, through their engineer or otherwise, made it clear to Kenmore that approval of its subdivision plan would require a need to deal with sewage, that the Authority would not support the less expensive options Kenmore might have undertaken, that the Authority would support the more extensive Kenmore Line, that this extension cost more than $250,000, substantially more than other possible options, and that while Kenmore might have the opportunity to obtain reimbursements, this opportunity was eliminated when UPT accepted a plan to increase capacity through the Central Delaware County Authority. More particularly, Plaintiff complains that possible alternative sewer connections through already existing lines with the neighboring private

---

constructed (Doc. 20, pp. 9-10 of 37); Plaintiff's Response to Defendants' Undisputed Facts in paragraph 60 (Doc. 17, p. 33 of 57), with respect what UPT and the Authority advised the Church representatives concerning a possible connection by the Church to the Kenmore Line (Doc. 20, pp.10-11 of 37).

development, Village of Rosetree or Park Place, would have been opposed by the Authority. (Doc. 19 at pp. 6-7). Plaintiff also complains that it may have had to file its own "537" plan with the Pennsylvania Department of Environmental Protection, which would have been opposed by UPT and the Authority. Kenmore then came to learn that it would be "required" to construct sewer lines sufficient to provide connections both for the ten homes in the Kenmore subdivision, but also for the School, the Church and the Residences (Doc. 19 at p. 8.) Plaintiff also asserts that the Authority failed to live up to the contractual agreements made in the SIDA of August 2007 which required reimbursement to Kenmore pursuant to a reimbursement agreement to be prepared, and that pursuant to the SIDA, Kenmore delivered its deed of dedication of the sewer line to the Township, the deed was accepted by the Township, filed of record in May 2009, but that the Authority has still failed and refused to enter into the reimbursement agreement. (Doc. 19 at 10-12.) Plaintiff further asserts that the Township failed to provide notice to the School, the Church or the Residences that they were to connect to the Kenmore Line, an event which was to provide the funding for the reimbursement to Kenmore. (Doc. 19 at p. 9.) Plaintiff further alleges that it was not until February 2009, when the construction work had been completed, that the Authority advised Kenmore and others that the School, the Church and the Residences were not to connect to the Kenmore Line, but rather were to connect to the new Authority sewer line which would not be subject to reimbursement to the benefit of Kenmore. (Doc. 19 at pp. 9-10.)

We measure this conduct against the rigorous "shock the conscience" standard. The United States Supreme Court in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998) has made clear and resolved any question about the applicability of this standard to 1983 due process violation cases. In *Lewis*, the plaintiff-decedent was killed following a high speed chase initiated by a Sacramento

police officer with what the Court clearly concluded was deliberate indifference to the survival of the passenger after the officer came upon a speeding motorcycle while responding to a call in his patrol car. It was necessary for the Supreme Court to consider the standard by which the governmental official's conduct would be measured. The Ninth Circuit had held that in the context of the high speed chase here, the appropriate standard of conduct would be to consider whether the officer was "deliberate[ly] indifferent to, or [had] reckless disregard for, a person's right to life and personal security." 98 F.3d 434, 441 (1996). The Supreme Court noted, however, that the other Circuits, including the First, Tenth, Third and Fifth Circuits had all used the more rigorous "shocks the conscience" standard. *See* 523 U.S. 833 at 839-840 (citing cases). In making its determination to resolve this Circuit split, the Court reminded us again that "the touchstone of due process is protection of the individual against arbitrary action of government." 523 U.S. at 845 citing *Wolff v. McDonnell*, 418 U.S. 539 (1974) and that this proposition is applicable both where there are allegations of a denial of a fundamental procedural fairness or in the exercise of power without any legitimate governmental objective. In cases dealing with allegedly abusive executive action, such as Plaintiff argues here, the Court has long emphasized that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'." 523 U.S. at 846, citing *Collins v. Harker Heights*, 503 U.S. at 129. The constitution is certainly not meant to "supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." 523 U.S. at 848, citing *Daniels v. Williams*, 474 U.S. at 322.

Rejecting the notion that customary tort liability would constitute a basis for shocking conduct, the Court held that "[i]t is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to

injure in some way unjustifiable by any general intent is the sort of official action most likely to rise to the conscience shocking level."  523 U.S. at 849.

The Third Circuit has considered the application of this legal standard with respect to due process claims where the alleged constitutional deprivation has occurred in a more deliberate context and concluded that the shock the conscience standard must still apply.  *United Artists Theatre Circuit, Inc. v. Township of Warrington PA*, 316 F.3d 392 (2003) concerned a 1983 action brought by United Artists, a movie theater operator who sought approval of a plan to construct a theatre facility in Warrington Township, Bucks County, Pennsylvania.  United Artists' claimed due process violations based upon delays in considering their development proposal, allowing a competitor who was willing to pay an "impact fee" which United Artists was unwilling to pay to achieve the benefit of approval of its development plan.  Petitioner complained that its proposal before the Township planning commission was not considered for some 14 months when the competitor, the Regal Group, found its proposal approved in final form in just four months.

Significant in the discussion of the case was evidence of a willingness of Regal to pay the $100,000 impact fee to the Township when United Artists refused to make that payment. Acknowledging Third Circuit precedent which set out an "improper motive" test which had been applied in the Third Circuit's line of land use cases (*see Woodwind Estates Ltd. v. Gretkowski*, 205 F.3d 118 (3d Cir. 2000)), the court held that this earlier precedent could not be reconciled with the recent expression of the Supreme Court in *Lewis*.  The Court thus found it necessary to abandon the "improper conduct" standard and applied the "shock the conscience" standard set out in *Lewis*.  In so doing, the Court clearly noted its disagreement with the District Court's assessment in *United Artists* that there were "few differences between the [shocks the conscience] standard and the

improper motive standard." To the contrary, the Court of Appeals held that the "improper" reference "sweeps more broadly" and no case ever suggested that something would be "improper" only if it shocked the conscience. 316 F.3d at 400. Citing *Lewis*, (523 U.S. at 846), the Court reaffirmed that this standard encompasses "only the most egregious official conduct." 316 F.2d at 400.

When we apply this standard, particularly given its utilization in the land use type cases which are closely analogous to the case under consideration here, we have no difficulty in concluding that Plaintiff's constitutional claim must fail. We observe that there is nothing in this case that suggests that there was a financial motive on the part of UPT or the Authority to act as they did such as the $100,000 impact fee which was a significant factor in *United Artists*. Nor is there any evidence offered by Plaintiff to demonstrate that the decisions that were made by the UTP or the Authority for the purpose of bringing harm to Kenmore or Mr. DiDomenico.[3]

Accordingly, we will grant defendants' motion for summary judgment with respect to Count One. Necessarily, Count Seven, calling for counsel fees under §1988, must fail as it is dependent upon Count One.

## RETENTION OF JURISDICTION

In light of the summary judgment grant with respect to the constitutional claims, it is necessary for us to make a determination as to whether or not the matter should be dismissed subject to being refiled in state court or whether this court should retain jurisdiction. We accept the fact that jurisdiction of Counts Two through Seven (all claims under state law) is based upon 28 U.S.C. § 1367(c)(3) and the question of whether to continue to exercise that jurisdiction after federal claims

---

[3]As Defendants have pointed out, Mr. DiDomenico testified at his deposition that he did not think that the UPT/Authority engineer (his principal contact) was trying to mislead him. (Exhibit 3 to the Motion, p. 76.)

have been dismissed such as here falls within the discretion of the district court. *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 129 S.Ct. 1862, 1865 (2009). In the exercise of this discretion, the Supreme Court has noted that the court ought to take into consideration a number of factors, including those enumerated in subsection (c) of §1367 which articulates that the court *may* decline to exercise supplemental jurisdiction if:

    (1)    The claim raises a novel or complex issue of State law,

    (2)    The claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

    (3)    The district court has dismissed all claims over which it has original jurisdiction, or

    (4)    In exceptional circumstances where there are other compelling reasons for declining jurisdiction.

The commentary following 28 U.S.C. § 1367 indicates that from the temporal context the exercise of this discretion "should hinge on the moment within the litigation when the dismissal of the touchstone claim takes place, and on other surrounding circumstances." Here, we believe that this factor weighs heavily in favor of the court exercising its discretion to retain the jurisdiction. As is evident from the summary judgment submissions, the parties have expended significant effort in conducting discovery in this case. They have presented the court with the transcripts of nine depositions taken and, importantly, they have already begun process of final preparation for trial which has been specially listed to commence on December 6, 2010. Clearly there has been substantial expenditure of time, effort and money in preparing the remaining claims and the question of fairness to one or even both of the parties arises. When the court inquired at oral argument as to the positions of the parties on the question of whether we should retain jurisdiction if the

constitutional claims were dismissed, both counsel acknowledged that it was completely within the court's discretion. The defendants, however, suggested that perhaps given the state law nature of the claims, dismissal in favor of a state court action would be more appropriate. Plaintiff, not surprisingly, took the opposite view, perhaps because of a desire to move the case to trial more quickly. We believe that the question of overall judicial economy and in the interest in bringing this matter to conclusion more promptly, clearly weighs in favor of retaining jurisdiction and outweighs the fact that what remain are state law claims only, particularly given the circumstance where the court has devoted considerable time and effort in reviewing the matter as it has been presented to it in consideration of these motions for summary judgment. Accordingly, the court will retain jurisdiction and counsel shall be ready to commence trial at 9:30 a.m. on Monday, December 6, 2010.

BY THE COURT:


 /s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE