IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| 55 KENMORE LANE, LLC, : |  |
| *Assignee of Kenmore Woods, LLC* : |  |
| : |  |
| Plaintiff, : |  |
| : | CIVIL ACTION NO. 10-1089 |
| v. : |  |
| : |  |
| UPPER PROVIDENCE TOWNSHIP : |  |
| SEWER AUTHORITY, : |  |
| : |  |
| Defendants. : |  |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE                                                             February 11, 2011
UNITED STATES MAGISTRATE JUDGE

**I.**     **Introduction**

Plaintiff, 55 Kenmore Lane, LLC (alternately "Plaintiff" or "Kenmore"), controlled by a Delaware County developer, Robert DiDomenico, brought this action against the Upper Providence Township Sewer Authority (alternately "Defendant" or "Authority"). Plaintiff seeks reimbursement of a pro-rata percentage of expenditures incurred in the construction of an extended sewer line (the "Kenmore Line" or "Line") to support of a residential development project which Kenmore's assignor, Kenmore Woods, LLC. (also referred as "Kenmore"), was undertaking known as 211 Sycamore Mills Road, Upper Providence Township, Delaware County. Plaintiff brought claims for breach of contract, promissory estoppel, unjust enrichment, misrepresentation and denial of due process under the Fourteenth Amendment. The misrepresentation and due process claims were dismissed at summary judgment, and trial proceeded before a jury on the contract and quasi-contract claims.

It is undisputed that the parties reached a binding agreement, memorialized in writing on August 8, 2007 in a document entitled the "Sewer Improvement Development Agreement" ("SIDA"). It is also undisputed that Kenmore had fulfilled its obligations under that agreement by properly constructing the Kenmore Line and dedicating it to the Authority. The parties also agree that, at some point, it was at least contemplated that certain other properties, namely the Reformation Lutheran Church (the "Church"), the Springton Lakes Middle School (the "School"), and ten adjacent residential properties would be in a position to connect to Line and could therefore provide a source for *some* reimbursement to Plaintiff. Finally, the parties agree that at least one of the residential properties had connected to the Line, but that neither the Church nor the School had done so.

The focus of the factual dispute concerned the nature of the agreement that had been reached between the parties as well as the extent and legal effect of any representations the Authority may have made to Plaintiff regarding reimbursement. While the parties agreed that Kenmore would bear full responsibility for that portion of the Line serving its subdivision, 32.9% of the total construction costs, the dispute left unresolved the question of Plaintiff's entitlement to reimbursement of the remaining 67.1%. Defendant argued that the extent of the reimbursement was tied to, and dependent upon, which of the remaining properties actually connected to the Line. The Defendant also argued that the reimbursement did not include the costs of "grinder pumps" and that Plaintiff was not entitled to recoup certain "tapping fees" which it had been required to pay in order to obtain permits for occupancy of the ten houses in the Kenmore subdivision. Plaintiff argued that, based upon the Defendant's promises, it was entitled to all of this reimbursement without regard to what properties actually connected to the Line, or indeed without the necessity of any property connecting to the

2

Line. The parties agreed that the question of reimbursement of construction costs and for the grinder pumps would be put to the jury at trial, while the court would resolve the question of reimbursement of the tapping fees.

Of central importance to the resolution of those issues put to the jury was the necessity to resolve two ambiguities in the SIDA. The first concerned what conditions precedent would be required to trigger entitlement to any reimbursement. The second concerned whether any reimbursement would include the cost of the grinder pumps. Each party presented to the Court its interpretation of the agreement. The Court found both interpretations to be reasonable, and had them presented to the jury in its instructions and by way of special interrogatory.

Plaintiff contended that the parties agreed that it would be entitled to recover its full proportionate share of the costs and expenses of constructing the Kenmore Line (the 67.1%) upon the event of the completion of the Line and the Authority's acceptance of the deed of dedication, and certainly upon the connection of any one property not in the Kenmore subdivision to the Line. According to Plaintiff, the Authority had identified the source of that reimbursement as the connection fees from the Church, the School and the residences, and that reimbursement was conditioned only upon satisfactory completion of the project and dedication of the deed, and not upon having any of those properties actually connect to the Line. Plaintiff contended that the Authority had promised to direct those properties to connect to the Line, and that it breached its agreement by constructing its own sewer line and directing the Church, the School and some of the ten residences to connect to the Authority's line and not to the Kenmore Line. Plaintiff also contended that the parties had agreed that the cost of the grinder pumps would be included in the reimbursement.

The Authority, on the other hand, denied making any promises or representations that the Church, the School or the residential properties would be directed to connect to the Kenmore Line, and contended that the parties had agreed that Plaintiff's reimbursement would be calculated based only upon the properties that actually connected to the Line. The Authority also asserted that the cost of the grinder pumps was not part of the contemplated reimbursement.

The jury resolved the two ambiguities in Plaintiff's favor and found for Plaintiff on the breach of contract claim. More particularly, it found by way of answering jury interrogatories that Plaintiff was entitled to full proportional reimbursement independent of the number of properties that connected to the Line, and that the cost of the grinder pumps was part of the agreed reimbursement. The parties had agreed prior to trial that the proportional reimbursement sum was $130, 938.66 and the cost of grinder pumps was $40,000.

It is now appropriate for the Court to consider the issue of whether Plaintiff is entitled to recoup "tapping fees" in the amount of $24,300, $2,700 for each of the nine homes in the Kenmore subdivision, that Plaintiff paid in order to obtain residency permits for the homes. Plaintiff was required to pay these fees after it had completed construction of the Kenmore Line, dedicated the Line to the Authority, and was seeking to obtain occupancy permits for the homes in the development. The parties have agreed that the amount of the fee was $2,700 per residence. (Ex. 30). Plaintiff, through counsel, objected to payment of the fees at that time, but eventually paid them in order to secure the necessary permits. (Doc. 56 at 3.)

Plaintiff now contends that, under the Municipal Authorities Act, 53 Pa.C.S. § 5600, et seq. (hereinafter "MAA"), it should not have been required to pay the tapping fees since it constructed the Kenmore Line itself and dedicated the Line to the Authority. According to Plaintiff, and relying

4

upon Section 5607(d)(24)(i)(C), such a dedication was made "in lieu of" paying the tapping fee.

Section 5607 of the MAA deals with the "purposes and powers" of a municipal authority incorporated under this provision. These purposes and powers include "constructing," "maintaining and operating," "sewers, sewer systems or parts thereof." See 53 Pa.C.S.A. § 5607(a). As authorized by subsection (d), the Authority "may exercise all powers necessary or convenient for the carrying out of the purposes set forth in this section," including at subsection (24), "[t]o charge enumerated fees to property owners who desire to or are required to connect to the Authority's sewer or water system." These shall be based upon "... the duly appointed fee schedule which is in effect at the time of payment and shall be payable at the time of the application for connection or at the time to which the property owner and the Authority agree ..." Subsection (24) goes on to further delineate the "fees" and articulates that they:

> may include any of the following if they are separately set forth in resolution adopted by the Authority:
>
> (A) Connection fee.
>    ***
> (B) Customer facilities fee.
>    ***
> (C) Tapping fee.

In that the limited issue before us concerns reimbursement of the "tapping fee" only, we need not concern ourselves either with the "connection fee" or "customer facilities fee." In attempting to address the "tapping fee," we are mindful of the admonition of counsel that we would find virtually no case law to guide us through the complexities and entanglements with which this particular litigation, and the statute which underlies it, is fraught.

Nevertheless, in an effort to undertake our responsibility, we start with the statutory language,

which states at § 5607(d)(24)(i)(C):

> A tapping fee shall not exceed the amount based upon some or all of the following parts which shall be separately set forth in the resolution adopted by the Authority to establish these fees. **In lieu of payment of this fee, an Authority may require the construction and dedication of only such capacity, distribution-collection or special purpose facilities necessary to supply a service to the property owner or owners.**

(emphasis added).

The first question that arises from the provision concerns whether there was a "resolution adopted by the Authority to establish these fees." In this regard, Plaintiff has directed our attention to resolution 2010-05-01 adopted by the Authority Board on May 13, 2010. While this particular resolution post-dates the date of the construction and dedication of the Line, we understand it to be provided to us to the extent that it refers to a previous Authority resolution, number 05.06.01, adopted on June 8, 2005. This is the appropriate resolution for us to consider. As referred to in the 2010 resolution, the 2005 resolution increased the tapping fee to $2,700.00 per EDU (Equivalent Dwelling Unit). We note that the 2010 resolution identifies four components: the "capacity part," the "collection part," the "reimbursement component" and the "special purpose part." The $3,400 fee laid out in the 2010 resolution is allocated between only the "capacity part" and the "collection part" in equal amounts of $1,700 each. What the record does not show, however, is the manner in which the $2,700 per EDU tapping fee paid by Plaintiff, based upon the June 8, 2005 resolution, which the parties have agreed is applicable here, was divided up between "capacity part" and "collection part," or what, if any, "reimbursement component" or "special purpose part" may have been applicable to that determination of the $2,700 sum.

While this reference is important as it helps us understand what may be involved in the

Authority's calculation of the tapping fee, its relevance is secondary to the SIDA, and the MAA, which controls the principal question before us concerning reimbursement. Paragraph 15 of the SIDA directs us specifically to § 5607(d)(31)(iv). Indeed, the language could not be more clear where it states, "[t]he amount of the reimbursement which Developer may receive shall be calculated in accordance with 53 Pa. C.S.A. § 5607(d)(31)(iv)." (Ex. 12 at 6.) We also note that plaintiff has persistently argued that this specific provision was the basis for its claim that the tapping fees would be reimbursable. *See* Exhibit 24, Letter from plaintiff's former counsel, Donald Petrosa, Esquire to Authority counsel, Robert Pinto, Esquire dated April 9, 2009 ("I direct your attention to paragraph 15 of the Sewer Improvement Development Agreement which indicates that the amount of the reimbursement which the Developer may receive shall be calculated in accordance with Section 5607(d)(31)(iv)").

As applicable here, § 5607(d)(31) addresses the extent of reimbursement which is owed to a property owner who constructs a sewer extension line at his or her own expense. It states initially that:

> Where a property owner constructs or causes to be constructed at his expense any extension of a water or sewer system of an authority, the Authority shall provide for the reimbursement to the property owner when the owner of another property not in the development for which the extension was constructed connects a service line directly to the extension within ten years of the date of dedication of the extension to the Authority in accordance with the following provisions:

The statute then sets out in five separate sub-parts certain requirements for the Authority to comply with, including providing the property owner with an itemized listing for which the reimbursement will be provided, providing for proportional payments among those from whom the reimbursements may be derived and ultimately to providing notice to the appropriate property owners. It then states

7

at subsection 5607(d)(31)(iv):

> "(iv) The total reimbursement which a property owner may receive may not exceed the cost of labor and material, engineering design charges, the cost of performance and maintenance bonds, authority review and inspection charges as well as flushing and televising charges and any and all charges involved in the acceptance and dedication of such facilities by the authority, **less the amount which would be chargeable to the property owner based upon the authority's collection and distribution tapping fees** which would be applicable to all lands of the property owner directly or indirectly served through extensions if the property owner did not fund the extension."

53 Pa.C.S.A. § 5607(d)(31)(iv) (emphasis added).

We consider this language to be controlling given its specific reference in the SIDA. We also construe it along with the language of § 5607(d)(24) in accordance with the cannons of statutory construction so as to give effect to the legislative intent of the Pennsylvania General Assembly. See 1 Pa.C.S. § 1921. It is an axiomatic rule of statutory construction that words and phrases are to be given their plain and ordinary meaning wherever possible, and the particular sections of the statute must be considered in the context of the statute as a whole, rather than in isolation, in a manner that avoids redundancy and gives effect to each section. *See, e.g., Mishoe v. Erie Ins. Co.*, 824 A.2d 1153, 1155 (Pa. 2003).

Applying these cannons to the MAA, it is evident to us that the purpose of the tapping fee is broader than what is suggested by Kenmore. The language and structure of Section 5607(d)(24)(c) specifically sets out the several "parts" of the fee, the "distribution and collection tapping fees" being only one "part." As laid out in § 5607(d)(24)(c), the "parts" include: (1) the "capacity part" which is "based upon the cost of capacity-related facilities, including, but not limited to, source of supply, treatment, pumping, transmission, trunk, interceptor and outfall

mains, storage, sludge treatment or disposal, interconnection or other general system facilities;" (2) the "distribution or collection part" which is "based upon the cost of distribution or collection facilities required to provide service, such as mains, hydrants and pumping stations;" (3) the "special purposes part," which is "applicable only to a particular group of customers or for serving a particular purpose or a specific are based upon the cost of the facilities;" and (4) the "reimbursement part" which is charged "to the users of certain specific facilities when a fee required to be collected from such users will be reimbursed to the person at whose expense the facilities were constructed." 53 Pa.C.S.A. § 5607(d)(24)(c)(I) - (IV). Taken together, the structure and language of Section 5607(d)(24)(C) indicate that the purpose of the tapping fee is to compensate the Authority for something more than "distribution and collection" as may be related to this single sewer extension line.[1]

We see nothing in Section 5607(d)(31)(iv) that is contrary to our conclusion. This section does not address the issue of whether or not a property owner must pay a tapping fee, but rather is limited to the question of reimbursement to a property owner for constructing a particular sewer extension line. It provides that such a reimbursement is limited to the total construction costs less "the amount which would be chargeable to the property owner based upon the authority's collection and distribution tapping fees which would be applicable to all lands of the property owner directly or indirectly served through extensions if the property owner did not fund the extension." The reference to tapping fees in this section is only to one "part" of the fee -

---

[1] We note that the Authority's main argument against Plaintiff's claim is that it would be inequitable to both reimburse Plaintiff for the construction costs of the Kenmore Line and excuse his payment of the tapping fee, which is paid in exchange for the benefit of tapping into the larger-distribution collection system rather than only the benefit of a particular sewer extension line. We find it unnecessary to address this argument directly.

the "collection and distribution" part. While Plaintiff may be entitled to some reimbursement under this provision for some portion of the tapping fee, it is not entitled to reimbursement of the entire "collection and distribution tapping fees." In that Plaintiff gives us no basis upon which to separate out this "collection and distribution" part, we conclude that it has failed in its proof. We have no alternative other than to find for Defendant on this aspect of the claim.

An appropriate order follows.

BY THE COURT:


 /s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE